Copied

FILED by _____ D.C.

FEB 2 0 2015

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

    vs.

DELOITTE & TOUCHE LLP,

                    Defendant.

Civil Action No: 1:14-cv-23713-UU

[FILED UNDER SEAL]

## FEDERAL HOME LOAN MORTGAGE CORPORATION'S
## FIRST AMENDED COMPLAINT

Plaintiff Federal Home Loan Mortgage Corporation ("Freddie Mac") brings this complaint against Defendant Deloitte & Touche LLP ("Deloitte") and alleges as follows:

### INTRODUCTION

1.    From 2002 through 2009, Deloitte violated its duties and professional standards by ignoring red flags warning of a fraud occurring at its audit client, Taylor, Bean & Whitaker Mortgage Corporation ("TBW"). Contrary to Deloitte's annual unqualified certifications that TBW's financial statements represented accurately its financial condition, the fraud – orchestrated by TBW's most senior officers over the course of seven years – permeated TBW's financial statements, rendering them materially false in numerous respects. With full knowledge that Freddie Mac was relying on its annual audit reports, Deloitte turned a blind eye to evidence of the fraud, allowing it to continue and grow.

2.      As a consequence of its reliance on Deloitte's materially flawed audit reports, Freddie Mac suffered more than $1.3 billion in damages, plus interest, which it seeks to recover in this action.

3.      Prior to TBW's collapse into bankruptcy in 2009, Freddie Mac purchased billions of dollars of mortgage loans from TBW, an authorized Freddie Mac Single-Family Seller/Servicer ("Seller/Servicer").

4.      As a condition to selling loans to, and servicing loans for, Freddie Mac, TBW was required to provide Freddie Mac with annual audited financial statements ("Audited Financial Statements") prepared in accordance with generally accepted accounting principles ("GAAP").

5.      Freddie Mac required that the Audited Financial Statements be accompanied by an independent auditors' report ("Independent Auditors' Report") containing the unqualified opinion of a Certified Public Accountant ("CPA") based upon an audit conducted in accordance with generally accepted auditing standards ("GAAS").

6.      Freddie Mac also required TBW to provide Freddie Mac with an annual audited report on TBW's internal controls ("Internal Control Report").

7.      Deloitte served as TBW's independent auditor for fiscal years 2002 through 2009. Under GAAS, as TBW's auditor, Deloitte owed a duty to plan and perform its audits in order to obtain reasonable assurance that the Audited Financial Statements were presented fairly, in all material respects, such that they were free of material misstatement, whether caused by error or fraud. Deloitte admitted that it had this obligation in each of its Independent Auditors' Reports.

8.      For each of TBW's fiscal years ending in 2002 through 2008, Deloitte provided an Independent Auditors' Report that gave an unqualified opinion on TBW's Audited Financial Statements and certified that they were free of material misstatement due to error or fraud.

2

9.    Deloitte's audits were seriously flawed:  they were inadequately designed and performed, and failed to reduce the risk of -- let alone detect -- the fraud conducted by TBW's senior management ("TBW Management" or "TBW Managers").

10.    Starting in 2002, the same year Deloitte began auditing TBW, TBW Managers commenced a fraud involving the misappropriation of hundreds of millions of dollars and the creation of hundreds of millions of dollars in fictitious loans.  The fraud resulted in material misstatements of TBW's assets and revenue (among other material errors) in TBW's Audited Financial Statements.

11.    Yet because Deloitte's performance of its audits did not comply with GAAS, it failed to detect the fraud for more than seven years and annually certified, as materially accurate, TBW's fraudulent Audited Financial Statements.

12.    Deloitte's audits were marred by Deloitte's lack of understanding of TBW's business operations, inadequate responses to material financial statement risks, and failure to apply necessary professional due care and skepticism.  As a result, Deloitte repeatedly overlooked or chose to ignore the red flags that it encountered during its audits.  Rather than investigate the red flags through competent evidence, Deloitte engaged in a campaign of willful ignorance, accepting the last-minute, inconsistent, and unsupported explanations of TBW Management, including the criminals who were orchestrating the fraud.  Those explanations were contradicted by information gathered by Deloitte during its audit, yet Deloitte relied on them anyway.

13.    Deloitte's lack of professional skepticism caused it to ignore red flags that should have precluded its unqualified audit opinions.  In the face of billions of dollars of accounting

misstatements and inconsistencies in the audit evidence it received, Deloitte failed in at least the following ways:

      a.     Deloitte disregarded its own audit plans and failed to perform sufficient audit procedures necessary to audit the accounting treatment of loans purportedly sold by TBW to Colonial Bank ("Colonial") under two warehouse facilities, referred to as the COLB and the AOT, after receiving audit evidence that: (i) revealed material breaches of the key underlying contractual obligations, and (ii) contradicted the assumptions on which Deloitte based its determination that the transactions were true sales under GAAP;

      b.     Deloitte failed to perform sufficient procedures to properly assess and understand the valuation of TBW's mortgage servicing rights ("MSRs") when confronted with audit evidence showing inconsistencies between Deloitte's understanding of TBW's business and the valuation given to TBW's MSRs by a third party;

      c.     Deloitte failed to comply with its own audit plan, to understand the relationship between TBW and Ocala Funding, LLC ("Ocala"), its wholly owned subsidiary, and to gather sufficient audit evidence to support its understanding of material inter-company transactions between the two companies, which were reporting inter-company receivables incompatible with the companies' business purposes and governing agreements;

      d.     Deloitte improperly wrote off the risk of – and failed to properly test for – fraud in TBW's revenue, including the risk that reported gains on mortgage loan sales could be overstated;

e.   Deloitte failed to apply necessary audit procedures when assessing TBW's allowances for various loan and loan-related accounts, despite being confronted with information indicating that such allowances were either insufficient, unsupported, or missing;

f.   Deloitte failed to perform any audit procedures when faced with evidence that TBW was misusing the AOT and COLB facilities by transferring non-qualifying repurchased loans to those facilities in violation of the operative agreements; and

g.   Deloitte relied on internal controls and management representations related to asset valuation and sales recognition that it knew were flawed or insufficient to prevent or detect material misstatements.

14.   These failures, among others, caused Deloitte to miss the fraud and the associated material misstatements in TBW's Audited Financial Statements.   Indeed, Deloitte staffed the audit in a way that led to this result.   Rather than utilizing sufficiently qualified professionals who were experienced in this particular field, Deloitte assigned inexperienced and insufficiently qualified auditors.   Deloitte also placed the supervision of the audit in the hands of managers who were admittedly unfamiliar with the governing standards and were unlikely to question the representations of TBW's management.

15.   By certifying TBW's Audited Financial Statements, Deloitte validated those financial statements and gave them an imprimatur of legitimacy that allowed TBW to sell loans to Freddie Mac from 2002 through 2009 despite an ongoing fraud.

16.   As TBW's auditor, Deloitte knew that Freddie Mac would receive and rely on its Independent Auditors' Reports to do business with and purchase loans from TBW.   Indeed, Deloitte knew that, as a Freddie Mac Seller/Servicer, TBW was required to submit the Audited

5

Financial Statements and Independent Auditors' Reports to Freddie Mac for Freddie Mac's reliance in purchasing TBW-originated loans.

17.     In reliance on Deloitte's Independent Auditors' Reports and the Audited Financial Statements, Freddie Mac purchased billions of dollars in mortgage loans from TBW that it would not have otherwise purchased had Deloitte discharged its duties and complied with professional standards.

18.     Because of Deloitte's failings, Freddie Mac suffered in excess of $1.3 billion in damages, plus interest, arising from its loan purchases from TBW.

## PARTIES, JURISDICTION, AND VENUE

19.     Freddie Mac is a corporate instrumentality of the United States, duly organized and existing under the laws of the United States of America.  In 2008, the Director of the Federal Housing Finance Authority placed Freddie Mac into conservatorship pursuant to the Housing and Economic Recovery Act of 2008.  Freddie Mac has its headquarters in McLean, Virginia, and conducts business in Florida.

20.     Deloitte is a limited liability partnership.  Deloitte has partners who reside in Florida, and Deloitte performed its audits of TBW in Florida.  During its audits of TBW, Deloitte was acting under a license issued under Florida law to conduct audits in Florida and was bound by Florida law in conducting those audits.

21.     Jurisdiction is proper under 12 U.S.C. § 1452(f).

22.     Venue is proper in this Court because the Complaint was removed from the Miami-Dade County court and because Deloitte has partners, agents, and representatives in Miami-Dade County and maintains offices in Miami-Dade County at 333 SE 2nd Avenue, Suite

3600, Miami, Florida 33131. Deloitte transacts and transacted business in Miami-Dade County, including conducting the audits of TBW that are at issue in this complaint.

23.     In addition, Deloitte has accepted service and appeared in this case, so it is subject to personal jurisdiction.

## FACTS

**A.     TBW Originated, Sold, and Serviced Mortgages.**

24.     TBW was a mortgage lending and servicing company incorporated in Florida, in 1991, with its principal offices in Ocala, Florida. TBW's core businesses were: (i) originating, underwriting, processing, and funding conventional, residential mortgages; (ii) selling mortgages to investors, including Freddie Mac; and (iii) servicing mortgages, including processing mortgage payments.

25.     By the time TBW filed for bankruptcy on August 24, 2009, it claimed to be the largest privately-owned, non-depository, residential-mortgage originator in the United States. Just before it ceased operations, TBW claimed that it was originating mortgages at a rate of more than $30 billion per year and was servicing approximately 512,000 mortgages totaling more than $80 billion in unpaid principal balance.

26.     TBW originated mortgages through mortgage brokers and, less commonly, purchased mortgages from third parties known as correspondent banks.

27.     As Deloitte knew, TBW did not typically hold the mortgages for its own accounts. TBW sold the mortgages or repackaged them into pools and sold participation interests (securities) to third-party investors, including Freddie Mac.

28.     Deloitte also knew that TBW typically retained the MSRs relating to the loans TBW sold to third parties. MSRs constitute the right to service the mortgages by, among other things, collecting principal, interest, tax, and insurance payments from the homeowner, and remitting principal and interest payments to the mortgage-holding investor, such as Freddie Mac. TBW retained a portion of these receipts as compensation for its servicing activities.

**B.     TBW Was An Approved Freddie Mac Seller/Servicer.**

29.     Freddie Mac was chartered by Congress under the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§1451-59. Congress created Freddie Mac for the purpose of increasing the funds available to homebuyers by creating a secondary mortgage market for the purchase and sale of conventional, residential mortgage loans. To achieve this congressionally mandated purpose, Freddie Mac purchases conventional mortgage loans from mortgage Seller/Servicers approved by Freddie Mac, pools those loans into mortgage-backed securities, and then sells those securities to investors, among other activities.

30.     When Freddie Mac purchases mortgage loans from authorized Seller/Servicers, it typically contracts with the Seller/Servicers to service the loans. Seller/Servicers agree to sell and service mortgage loans pursuant to the terms and conditions contained in certain purchase documents (the "Purchase Documents"), which consist of, among other things, the Freddie Mac Single-Family Seller/Servicer Guide ("Guide"), a purchase contract, and periodic bulletins issued by Freddie Mac. The Guide sets forth in detail the terms and conditions under which a Seller/Servicer may sell loans to Freddie Mac and service those loans for Freddie Mac.

31. As a condition to a Seller/Servicer's continued authorization to sell loans to Freddie Mac, the Guide requires that a Seller/Servicer provide Freddie Mac annually with Audited Financial Statements audited by and Internal Control Reports prepared by an independent CPA that conducts its audit in compliance with the applicable provisions of the public accountancy law and rules of the jurisdiction where the audit is conducted.

32. The Purchase Documents and the Guide also required the Seller/Servicers to make representations and warranties about the mortgages sold to Freddie Mac and to repurchase the mortgage loans upon violation of those representations and warranties.

33. From 1998 until August 2009, TBW was an authorized Freddie Mac Seller/Servicer.

34. As TBW's auditor, Deloitte knew that TBW had engaged Deloitte because TBW needed a clean audit report issued by an independent CPA – after an audit that complied with the applicable provisions of GAAS under the public accountancy law and rules of Florida – in order to maintain TBW's status as a Freddie Mac Seller/Servicer and to continue selling mortgage loans to Freddie Mac.

35. In fact, Deloitte knew that TBW intended to provide Deloitte's Independent Audit Reports to Freddie Mac for Freddie Mac's reliance and that Freddie Mac used and relied on Deloitte's Independent Auditors' Reports of TBW's Audited Financial Statements and the corresponding Internal Control Reports in purchasing loans from TBW.

36. In reliance on Deloitte's Independent Auditors' Reports of TBW's Audited Financial Statements, Freddie Mac purchased billions of dollars of mortgage loans from TBW.

C. TBW Financed Its Operations Through Third-Party Lines of Credit.

37.    As part of its audits, Deloitte had a duty to understand TBW's business and to scrutinize TBW's accounting for its material business operations and financing transactions.

38.    TBW's business model depended heavily on its ability to fund the origination of mortgage loans, which required TBW's continual access to cash.

39.    To satisfy its upfront loan-funding obligations, TBW relied on third-party financing. In particular, TBW primarily relied on lines of credit and financing vehicles provided by Colonial and later Ocala.

40.    Initially, Colonial served as TBW's primary source of financing. Colonial provided TBW with two warehouse facilities, referred to as the COLB and the AOT. The COLB and the AOT were structured as mortgage-loan participation ("warehouse") facilities through which Colonial purchased from TBW short-term interests in mortgage loans, pending resale of the loans to third-party investors such as Freddie Mac within a 90-day time period.

41.    Through the COLB, Colonial was supposed to purchase a 99% interest in whole mortgage loans from TBW.

42.    Through the AOT, Colonial was supposed to purchase a 99% interest in pools of loans from TBW.

43.    The COLB and AOT facilities were structured so that the underlying transactions would qualify, and be accounted for, as sales by TBW to Colonial of the 99% interest in mortgage loans, rather than financing transactions (*i.e.*, loans of funds by Colonial to TBW).

44.    In January 2005, to increase TBW's access to financing, Ocala was formed as a wholly-owned subsidiary of TBW. TBW was the managing member of Ocala and, in that capacity, managed Ocala's business activities.

45.     To raise funds, Ocala issued short-term promissory notes to investors in the facility.

46.     The proceeds of the note sales were used by Ocala to purchase loans from TBW. TBW in turn utilized the sales proceeds received from Ocala to underwrite additional mortgages and purchase mortgages from other lenders.

47.     Under the terms of the controlling documents for Ocala, the amounts owed by Ocala pursuant to the issued and outstanding notes were to be secured by collateral consisting of mortgages and cash owned by Ocala.

**D.     TBW Management Committed a Fraud.**

48.     Beginning in 2002, TBW's CEO Lee Farkas and other TBW Managers commenced their fraud.

49.     The fraud initially consisted of shifting money among accounts at Colonial to disguise overdrafts TBW incurred in its main operating account.  After the close of business each day and before automatic overdraft reports were generated, Colonial would "sweep" money from TBW's auxiliary accounts into its master account.  It would then return the money to the auxiliary accounts the following day.  Through the sweep, TBW Managers intended to maintain the impression that TBW was not over-drafting the accounts.

50.     As the amount of money involved in the fraud grew into the hundreds of millions of dollars and as TBW's indebtedness mounted, the overnight sweeping of funds among accounts became insufficient to cover TBW's increasing shortfalls.

51.     Starting in 2003, TBW Managers began falsifying loan data to gain access to funds from the COLB warehouse facility.  In furtherance of this fraud, TBW Managers created

false mortgage data (based primarily on loan data for mortgages that had already been sold to end investors) to support sales of phantom mortgages to Colonial.

52.     Because these mortgages were nonexistent, TBW could not resell them out of the COLB warehouse facility to third-party investors within the applicable time period.  As a result, TBW Managers created fraudulent data to give the appearance that TBW was periodically selling the mortgages out of the COLB facility—only to be replaced by newly falsified data, in a process referred to as "recycling."

53.     Starting in or about mid-2004, the fraud expanded from the COLB to the AOT warehouse facility.  TBW Managers caused the non-existent mortgages encumbering the COLB facility to be rolled over into the AOT facility through the purported sale to Colonial of pools of mortgage loans that did not exist.

54.     Thereafter, TBW Managers falsified more data so that TBW could sell hundreds of millions of dollars of additional fictitious pools of mortgage loans to Colonial through the AOT facility.  The assets backing these sales were non-existent or worthless, such as previously sold mortgages, completely fictitious mortgages, impaired-value mortgages, charged-off mortgages, mortgages in foreclosure, and real-estate owned ("REO") after foreclosure.

55.     After forming its Ocala subsidiary in 2005, TBW Managers misappropriated funds from Ocala's accounts through similar schemes involving fictitious mortgage data.

56.     Because it reused data from previously sold mortgage loans, TBW obtained proceeds from two, and sometimes three, parties relating to the purported sale of the same mortgage loans.  This double- and triple-selling of mortgage loans caused Freddie Mac, Colonial, and Ocala's investors to believe that they owned the same mortgage loans.

57.     This pervasive fraud resulted in material misstatements in TBW's Audited Financial Statements, which vastly overstated TBW's assets and income and understated its liabilities.

58.     Among other errors, receivables allegedly owed to TBW for fake mortgage sales were, in fact, not owed; income ostensibly earned on those sales was overstated, as was the value of mortgages held for sale; collateral backing TBW's debt obligations did not exist; and TBW's MSR assets were materially misstated.

E.     **Deloitte Audited TBW's Financial Statements and Internal Controls.**

59.     Deloitte audited TBW for the entire period of the fraud – the fiscal years ending April 30, 2002 through March 31, 2009.[1]

60.     As TBW's auditor, Deloitte agreed to plan and perform its annual audits in a manner sufficient to certify that TBW's financial statements were free of material misstatement, whether caused by error or fraud.

61.     Deloitte's auditor-in-charge for the TBW audits from 2006 to 2009, Edward Corristan, admitted under oath that Deloitte had a duty to detect fraud at TBW, testifying that "auditors are expected to identify fraud that would be material to the financial statements." Moreover, Corristan testified that Deloitte also undertook to report on TBW's compliance with laws and regulations because noncompliance may be material to the financial statements.

62.     Deloitte also issued the Internal Control Reports required by Freddie Mac, the U.S. Department of Housing and Urban Development, and the Government National Mortgage

---

[1] In 2009, TBW switched from a fiscal year ending April 30 to a fiscal year ending March 31.

Association. According to the applicable standards, Deloitte was required to report any material weaknesses in TBW's internal controls that did not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.

63.    For each fiscal year from 2002 through 2008, Deloitte issued an unqualified Independent Auditors' Report on TBW's Audited Financial Statements that enabled TBW to sell mortgage loans to Freddie Mac.

**F.    Deloitte Had a Duty to Comply with GAAS when Conducting its Audits of TBW and Issuing its Independent Auditors' Reports.**

64.    The professional standards applicable to Deloitte establish that accountants owe duties to "clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of CPAs to maintain the orderly functioning of commerce."[2] These standards require Deloitte's "acceptance of its responsibility to the public."

65.    This duty is so fundamental that both the United States Supreme Court and the Florida Supreme Court have declared public accountants like Deloitte "public watchdogs" because investors and creditors like Freddie Mac depend on accounting firms like Deloitte to do their job and certify only accurate financial statements. *See KPMG Peat Marwick v. National Union Fire Ins.*, 765 So. 2d 36, 38 (Fla. 2000); *accord United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984).

---

[2] American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct, ET Section 53.

66.     In each Independent Auditors' Report issued from 2002 through 2008 with respect to its audits of TBW, Deloitte certified its compliance with GAAS and Government Auditing Standards issued by the Comptroller General of the United States. During that same period, Deloitte certified that TBW's Audited Financial Statements were fairly stated in accordance with GAAP.

67.     Deloitte was precluded from issuing an unqualified audit opinion on TBW's Audited Financial Statements unless Deloitte complied with GAAS.

68.     GAAS sets forth the standard of care necessary for Deloitte's audits of TBW. GAAS includes several core concepts that auditors must employ:

> a.     *Independence*: The auditor must maintain independence in mental attitude in all matters relating to the audit.
>
> b.     *Professional care*: The auditor must exercise due professional care in the performance of the audit and the preparation of the report.
>
> c.     *Professional skepticism*:     The auditor must operate with professional skepticism regarding the evidence and representations of management.
>
> d.     *Evidential matter*.  The auditor must obtain sufficient competent evidence by inspection, observation, inquiries, and confirmations to provide a reasonable basis for an opinion and must not rely exclusively on representations of management.
>
> e.     *Understanding*: The auditor must obtain a sufficient understanding of the entity and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements, and to design the nature, timing, and extent of further audit procedures.

69.     More specifically, under GAAS, Deloitte had a responsibility to plan and perform its audits to obtain reasonable assurance that TBW's financial statements were free of material misstatement, whether caused by error or fraud.

15

70.     Under GAAS, Deloitte had a responsibility to apply due professional care, including exercising professional skepticism, throughout the audit process.   Professional skepticism required Deloitte to operate with a questioning mind and critical assessment of audit evidence, including its competency and sufficiency.

71.     Under GAAS, Deloitte had a duty to conduct the audit of TBW with a mindset that recognized the possibility that a material misstatement due to fraud at TBW could be present, regardless of past experience with TBW and regardless of any belief Deloitte may have had in the honesty and integrity of TBW Management.  In assessing the audit evidence, Deloitte similarly should not have been satisfied with less than persuasive evidence because of any such belief.  GAAS emphasizes that audit areas possessing higher degrees of risk (due in part to the nature, complexity, and size of specific accounts or classes of transactions), including fraud risk, require heightened due professional care and professional skepticism.

72.     Under GAAS, Deloitte had a duty to use the information it gathered to identify risks of fraud at TBW that might result in material misrepresentations.  Deloitte was obligated to assess this risk on an on-going and iterative basis and to change its assessment of the risks based on audit evidence, including discrepancies in the accounting records, conflicting or missing audit evidence, and hindrance of the audit by TBW's employees.  The standards required Deloitte to presume that there was a risk of material misstatement due to fraud relating to revenue recognition, such as revenue from the purported sale of loans to Colonial and from journal entries by management that fed into the profit and loss statements.

73.     Under GAAS, Deloitte should have designed and performed audit procedures whose nature, timing, and extent were responsive to the risks of material misstatement at TBW.  This required a clear linkage between the audit procedures Deloitte performed and the risks

Deloitte assessed.  To that end, Deloitte was obligated to audit TBW's financial statements cumulatively.  As Deloitte performed the audit, it needed to modify the nature, timing, and extent of its planned audit procedures based on the audit evidence it obtained from TBW.

74.    Under GAAS, Deloitte was obligated to collect sufficient appropriate audit evidence to reduce to an appropriately low level the risk of material misstatement in TBW's financial statements. In developing its opinion, Deloitte was required to consider all relevant audit evidence, regardless of whether it corroborated or contradicted the relevant assertions in TBW's financial statements.  If the existing audit evidence was not sufficient, Deloitte needed to obtain further audit evidence, express a qualified opinion, or disclaim an opinion.

75.    Under GAAS, Deloitte had an obligation to apply additional audit procedures to resolve inconsistencies in audit evidence collected from different sources.  Deloitte should have applied due professional skepticism in evaluating the quantity and quality of evidence and whether it was sufficient and appropriate to support its audit opinion of TBW.

76.    Under GAAS, Deloitte had an obligation to treat TBW Management's representations as part of, but not a substitute for, the application of auditing procedures necessary to afford a reasonable basis for its opinions regarding TBW's Audited Financial Statements.  This required, among other things, that Deloitte view TBW Management's assertions independently, objectively, and with professional skepticism and also verify those assertions with objective evidence.

77.    When Deloitte discovered that TBW Managers' representations were contradicted by other audit evidence, Deloitte was required to investigate the circumstances and consider the reliability of the representations made.  Deloitte was also required to consider whether its

reliance on TBW Management's representations relating to other aspects of its financial statements was appropriate and justified.

78.    Under GAAS, Deloitte had a duty not to state that TBW's financial statements presented fairly, in all material respects, TBW's financial position, results of operations, and cash flows in conformity with GAAP unless Deloitte formed its opinion on the basis of an audit performed in accordance with GAAS.

79.    Under GAAS, Deloitte was required to perform steps to assure itself that known recipients and users of TBW's Audited Financial Statements were informed of material misstatements resulting from the discovery of new evidence obtained subsequent to the issuance date of the Audited Financial Statements. These disclosures were to include the warning that Deloitte's related unqualified opinion(s) could no longer be relied upon. Deloitte was obligated to perform whatever steps were deemed necessary to satisfy itself that such disclosures were made.

80.    Accordingly, Deloitte's obligation under GAAS also included ensuring that Freddie Mac – which Deloitte knew was relying on the prior Audited Financial Statements – was notified that the prior years' statements were no longer reliable.

**G.    Deloitte's History of Violating Generally Accepted Auditing Standards.**

81.    For each of TBW's fiscal years ending in 2002 through 2008, Deloitte represented that TBW's Audited Financial Statements presented fairly, in all material respects, its financial position, the results of its operations, and its cash flow for each year, all in conformity with GAAP.

82. Contrary to Deloitte's representations, TBW's Audited Financial Statements were materially false in numerous respects, and Deloitte failed to conduct its audits in accordance with GAAS.

83. According to the Public Company Auditor Oversight Board ("PCAOB"), this was not the only time Deloitte failed to do its job.

84. The PCAOB is a private-sector, nonprofit corporation, established by Congress under the Sarbanes-Oxley Act. The PCAOB conducts annual inspections of, and issues reports on, the big-four auditing firms, including Deloitte. If the auditor fails to cure the criticisms in the report after twelve months, the report is made public.

85. On May 19, 2008 and October 22, 2013, the PCAOB publicly released reports issued to Deloitte because Deloitte failed to correct the criticisms levied against it.

86. In May 2008, the PCAOB criticized Deloitte's audit planning, its failure to address errors in its clients' application of GAAP, its failure to perform necessary audit procedures, its failure to obtain sufficient competent evidence to support its opinions, its poor quality control, its failure to evaluate management representations, its lack of objectivity and independence from management, and its "culture that allows, or tolerates, audit approaches that do not consistently emphasize the need for an appropriate level of critical analysis and collection of objective evidence, and that rely largely on management representations."

87. Indeed, among Deloitte's many failures criticized by PCAOB was Deloitte's blind reliance on management: "In too many instances, the inspection team observed that [Deloitte] engagement team's support for significant areas of the audit consisted of management's views or the results of inquiries of management. [Deloitte's] apparent failure to appropriately challenge management's representations occurred in numerous areas."

88.     The May 2008 PCAOB report covered the time period in which Deloitte conducted its 2007 audit of TBW, and the report's public release means that the deficiencies of Deloitte cited therein continued into 2008.  The report also heavily criticized audits led by Deloitte's Timothy Forrester, the Deloitte partner who served as the Engagement Partner for Deloitte's audits of TBW from 2002 through 2004.

89.     The May 2008 PCAOB report also noted that, with regard to its audit of one unidentified mortgage originator, Deloitte failed "to obtain sufficient competent evidential matter to support its audit opinion," including failing to (a) perform sufficient procedures to assess the valuation of certain of the issuer's privately-issued mortgage-backed securities holdings, (b) engage sufficient procedures to assess the valuation of the issuer's mortgages held for sale, (c) determine whether the issuer appropriately calculated its allowances for loan losses, and (d) analyze the accounting treatment of loans transferred by the issuer to intermediaries prior to their sale to ultimate investors.

**H.     Deloitte Violated Generally Accepted Accounting Standards When Auditing TBW.**

90.     The failures identified by the PCAOB are consistent with Deloitte's failures in auditing TBW.

91.     When auditing TBW, Deloitte failed in a number of over-arching ways:

    a.     Deloitte failed to understand TBW's business;

    b.     Deloitte failed to plan risk mitigation procedures to address the risks of material misstatement due to fraud that Deloitte did or should have identified, thus failing to properly position itself to uncover fraud during its audits;

    c.     Deloitte failed to perform planned audit procedures responsive to material financial statement risks; and

    d.     Deloitte failed to appropriately consider the risk of fraudulent revenue when planning its audits.

92.    Deloitte also failed to act on red flags it encountered during its audits:

    a.     Deloitte failed to properly consider whether red flags, including inconsistencies in the audit evidence and management misrepresentations it obtained, were indicative of material misstatements in TBW's Audited Financial Statements;

    b.     Deloitte failed to properly consider whether such red flags were indicative of deficient internal controls at TBW;

    c.     Deloitte failed to gather sufficient audit evidence in response to and necessary to resolve the red flags, internal control deficiencies, and its own planned audit procedures; and

    d.     Deloitte failed to apply due professional care and professional skepticism to evaluate, respond to, and resolve the contradictory assertions of TBW's management and clear inconsistencies between and within representations made by TBW Management and other audit evidence.

93.    Deloitte's repeated decisions to ignore professional standards of care were not merely negligent but were in conscious disregard of known risks to the recipients and users of TBW's Audited Financial Statements.  As a result, TBW Managers were able to continue and expand the fraud, and TBW repeatedly misstated its financial condition.

94.     With regard to the 2007 audit, Corristan, Deloitte's auditor-in-charge for the TBW audits from 2006 to 2009, assigned an inexperienced and insufficiently qualified manager, Jeffrey Bauman, to oversee the audit.  When Bauman complained that TBW was purposefully making the audit difficult for the Deloitte team and that Melissa Henry of TBW was effectively "in control" of the audit because "the team is brand new," Corristan failed to remedy the situation.

95.     Instead, Corristan forwarded the complaint to Mike Pacetti, Loreen Spencer, and George Lawrence, a Professional Practice Director at Deloitte, admitting that "our TBW team [is] relatively light on experience and more impacted by client attitudes."  Lawrence responded that "Jeff [Bauman] is probably right about Melissa [Henry]."  Lawrence also told Corristan to instruct Bauman to "read FAS140 in its entirety, if he is going to manage a mortgage bank audit"—something that Bauman had failed to do.

96.     In Corristan's reply to Lawrence, he acknowledged that Bauman "has not had enough experience" and also stated that Bauman had trouble standing up to Melissa Henry because he had previously worked for her when she was with Deloitte.  Corristan closed by concluding that "[h]e does not project a very positive persona to the team or client.  Another challenge when dealing with clients that do not warrant the A team."

97.     Deloitte's decision to staff the TBW audit with individuals who failed to make the "A team," and who were consequently unwilling and/or unable to expose the fraud being conducted by TBW Managers, resulted in Deloitte's continued rubber stamping of completely inaccurate and misleading financial statements on which Freddie Mac relied.

98.     Deloitte's misfeasances affected all substantive components of its audits of TBW. Deloitte failed to (a) gather and analyze appropriate audit evidence supporting the accounting

treatment of loans purportedly sold by TBW to Colonial prior to their sale to Freddie Mac and other investors; (b) perform sufficient procedures to assess the valuation of TBW's MSRs; (c) perform sufficient procedures related to TBW's consolidated debt obligations arising from its wholly-owned subsidiary Ocala and gather sufficient appropriate audit evidence to support its understanding of material transactions between the two companies; (d) apply procedures sufficient to mitigate the risk of fraud in revenue recognition; (e) require TBW to record proper allowances for loans and related balances and resolve questions raised by those balances indicating the improper transfer of non-qualifying, repurchased loans to the AOT and COLB facilities, even though those transfers were documented in Deloitte's work papers; and (f) plan and apply procedures to test billions of dollars of journal entries not subject to effective internal controls.

### I.    Deloitte Ignored Red Flags.

99.     Deloitte did not design audit procedures to sufficiently reduce the risk of material misstatements due to fraud. Instead, Deloitte repeatedly overlooked or chose to ignore the red flags that should have led to discovery of the TBW Managers' fraud and the resulting material misstatements in TBW's Audited Financial Statements.

100.     Rather than investigate the red flags, Deloitte accepted the inconsistent and unsupported explanations of TBW Managers, who were orchestrating the fraud. By failing to investigate red flags and gather sufficient appropriate evidence in response to inherent fraud risks, Deloitte violated GAAS.

101.     Deloitte's repeated decisions to ignore professional standards of care were negligent, reckless, grossly negligent, and in conscious disregard of known risks to the recipients and users of TBW's Audited Financial Statements, and allowed TBW's fraud to continue.

102.     In light of these repeated failures to comply with GAAS, Deloitte was precluded from issuing its unqualified opinions of TBW's Audited Financial Statements.

103.     Freddie Mac expressly required TBW to obtain an unqualified audit opinion from Deloitte as a condition of doing business with TBW.  Had Deloitte not issued its unqualified opinion, Freddie Mac would not have purchased loans from TBW.

104.     Deloitte disregarded its professional duties under GAAS on many occasions from 2002 until 2009, including as set forth herein.

a.     **Deloitte ignored inconsistent audit evidence indicating TBW's accounting for its COLB and AOT facilities violated GAAP.**

105.     A fundamental flaw in each of Deloitte's audits was the failure to properly audit the transactions between TBW and Colonial under the AOT and COLB facilities.

106.     The COLB and AOT purchase agreements and participation certificates between Colonial and TBW provided for Colonial's acquisition of a 99% participation interest in mortgage loans "sold" by TBW in exchange for Colonial's immediate, full, cash payment for the participation interest.

107.     Essential to Deloitte's audit was an accurate determination of whether transactions in the COLB and AOT facilities were properly described as sales rather than loans.

108.     If not sales, the moneys transferred from Colonial to TBW would have to be recorded as a loan secured by mortgages held on TBW's balance sheet with corresponding debts owed to Colonial, rather than as revenue from mortgages sold off of the balance sheet.

109.     Because the accounting for the AOT and COLB transactions was material to TBW's Audited Financial Statements, Deloitte's own audit plan required that the audit team apply multiple procedures to test those transactions.

110.     Deloitte's firm-wide guidance and audit plans applicable to its audits of TBW required, among other things, that (a) Deloitte obtain copies of and ensure compliance with the underlying AOT and COLB facilities or similar warehouse agreements; (b) secure a legal opinion that the transactions constituted true sales under FAS 140 and that the loans were legally isolated – a legal determination that Deloitte was not able to make on its own; and (c) perform testing, including "compar[ing] the fair value of sold portion to sales proceeds."

111.     Obtaining this evidence was critical to satisfying Deloitte's responsibilities under GAAS.

112.     In at least 2006 and 2007, Deloitte failed to collect the audit evidence mandated by its own audit plans.

113.     To start, despite the requirements of Deloitte's audit plans and its obligation to obtain an understanding of the transactions, Deloitte did not even obtain a copy of the AOT agreement to ensure it understood the transactions during its 2006 and 2007 audits. It lacked the very contract it was supposed to understand.

114.     Similarly, Deloitte did not obtain a legal True Sale Opinion for the AOT or COLB facilities until the 2008 audit. Indeed, in prior years, Deloitte documented that the attorneys looking at the issue expressed concern over whether the transactions were true sales; yet Deloitte failed to secure a True Sale Opinion.

115.     Nonetheless, at least as early as the 2006 and 2007 audits, the audit team misstated in Deloitte's working papers that they had obtained True Sale Opinions relating to the COLB and AOT transactions, when the work papers do not support that assertion but rather show that they had not obtained the True Sale Opinions.

25

116.     Rather than perform GAAS-compliant audits in 2006 and 2007, Deloitte's audit teams failed to comply even with their own audit plan, while incorrectly representing that they had.

117.     Without obtaining the audit evidence and related guidance required by its own audit plan, and GAAS, to determine whether the transactions were true sales under FAS 140, Deloitte nevertheless certified in 2006 and 2007 that the transactions qualified for sale treatment.

118.     It was not until its 2008 fiscal year audit that Deloitte for the first time received copies of legal opinions ("True Sale Opinions") in evaluating TBW's accounting treatment of its "sales" to Colonial.

119.     The True Sale Opinions concluded that the transactions could be treated as sales rather than loans if certain assumptions were satisfied, including that Colonial was making immediate cash payments to TBW equal to 99% of the applicable loan value.

120.     In 2008, Deloitte also consulted with its own internal specialist and obtained an opinion on the accounting treatment for the AOT transactions ("AOT Consultation Memo").

121.     The AOT Consultation Memo permitted classifying the AOT transactions as sales based on (i) the same assumption regarding cash payments, *i.e.* that Colonial was making immediate 99% cash payments for the participation interests, and (ii) the provision of a True Sale Opinion from a qualified law firm.

122.     The evidence contradicted these conditions and the underlying contractual requirements.  During its audits, Deloitte received and observed evidence from multiple sources demonstrating that Colonial was not paying 99% cash for its ownership interest in loans purchased under the COLB and AOT facilities.  Deloitte's audit files showed, and its lead auditor Edward Corristan confirmed under oath, that Deloitte knew that Colonial had been paying as little as 25% on some occasions -- far short of the 99% required under the agreements.

26

123.     For example, in 2008, Deloitte documented that, rather than immediately paying 99% of the sales price, Colonial was paying, on average, approximately 85%.

124.     Similar material shortfalls were apparent during at least 2006 and 2007 and were evidenced within Deloitte's audit working papers; however, 2008 was the first year that Deloitte inquired about the documented discrepancy.

125.     These underpayments were, to use Corristan's phrase, "red flags" that TBW and Colonial were not complying with their purchase agreements and that the assumptions underlying true sale treatment were not a reliable basis to support true sale treatment that was material to TBW's financial reporting.

126.     Corristan acknowledged under oath that if Colonial and TBW were not complying with their agreements, that failure would be a red flag to Deloitte:

> Q.     Well, sir, let me ask you a different way. If you'd have had a different understanding at the time, that in fact paying only 85 percent violated the contract between Colonial and Taylor Bean, would that have been a red flag for you?
>
> A.     If -- if we were aware of information that said that Colonial was violating their purchase agreement by not paying that amount timely, then, yes, that would have been a red flag.

127.     Corristan also confirmed that the impact of reporting such transactions as sales as opposed to loans was material to TBW's financial statements throughout the relevant periods: "It impacts their financial reporting."

128.     Deloitte's knowledge of these red-flag breaches of the AOT and COLB agreements and that the True Sale Opinions and the AOT Consultation Memo were based on faulty assumptions should have precluded Deloitte from issuing a clean audit opinion.

129.     Yet, Deloitte turned a blind eye to this evidence. Rather than seek to clarify the discrepancy between the assumptions and reality, Deloitte's lead audit partner concealed

Colonial's underpayment from Deloitte's internal consulting experts, despite having specific communications with the experts regarding what they described as the "infamous" 1% haircut that TBW retained.

130.    Specifically, Corristan did not disclose to the internal specialists that the actual haircut at the time was almost 15% on average, not 1% (or conversely that Colonial was paying on average 85% of the value of the loans, not 99%).

131.    Rather than resolve the inconsistencies between the requirements of the contracts and the conduct of TBW and Colonial through competent audit evidence, Deloitte simply relied on TBW Management representations that did not resolve the inconsistencies.

132.    Deloitte accepted the nonsensical explanation by TBW's CFO, Delton De Armas – one of the conspirators, that TBW frequently received a lower "advance rate" than was contractually required.

133.    Yet, De Armas's representation only heightened the conflict in the audit evidence because it was inconsistent with the AOT and COLB contracts, the True Sale Opinions, and the AOT Consultation Memo.

134.    Deloitte had an obligation to treat the De Armas representation with skepticism. Under GAAS, De Armas's statement on its own was not sufficient audit evidence, nor was it a substitute for audit procedures necessary to afford a reasonable basis for Deloitte's opinions regarding TBW's financial statements.

135.    Through Deloitte's failure to sufficiently audit TBW's accounting treatment of its fraudulent, material transactions with Colonial under the AOT and COLB facilities, TBW was able to hide from Freddie Mac and others billions of dollars in fake transactions.

136.     Had Deloitte complied with GAAS, TBW would not have been able to use the Colonial facilities to perpetrate its fraud.

**b.     Deloitte failed to perform audit procedures and gather appropriate evidence to resolve other billion-dollar discrepancies related to the AOT and COLB facilities.**

137.     Other audit evidence also pointed to TBW's misuse of the Colonial COLB and AOT facilities, but Deloitte still failed to apply sufficient audit procedures and to gather sufficient audit evidence about these transactions.

138.     Specifically, Deloitte received evidence that TBW's accounting for MSRs was inconsistent with its accounting for the corresponding sale of loans to Colonial.

139.     An MSR is an asset (or liability) that is valued, in part, based on the expected revenue earned and related expenses incurred over the life of each mortgage serviced.

140.     Deloitte knew that TBW's business model was to typically retain the MSRs when it transferred the loans to Colonial.  Pursuant to the AOT and COLB agreements, TBW was to act as the servicer for the mortgage loans on behalf of Colonial until the loans were resold.  Thus, assuming the legitimacy of the transactions at issue, TBW should have recorded an asset for the MSRs associated with the mortgage loans TBW sold to Colonial under the AOT and COLB facilities. And, TBW's MSR value for the loans on those facilities should have corresponded to the base value of the loans TBW "sold" to Colonial.

141.     From 2006 through 2008, however, evidence obtained by Deloitte reflected that TBW did not recognize MSR asset values for a significant portion of the loans that it purportedly sold to Colonial.

142.     This material inconsistency was not a mere oversight by TBW; it was a red flag result of the conspirators' creation of more than $1 billion in fake loans.  The fake transactions with Colonial lacked MSRs because there were no underlying mortgages to service.

29

143.    In at least 2006 and 2007, Deloitte simply accepted facially apparent discrepancies about the amount of loans being held off-balance-sheet (*i.e.*, the assets were transferred off TBW's books and onto the books of its counterparty Colonial) without further inquiry.

144.    In 2006, TBW hired SN Capital to value its MSRs.  Even though there should have been MSRs associated with the AOT and COLB facilities, SN Capital did not list any MSRs relating to those facilities.

145.    This discrepancy mandated further analysis by Deloitte.  Yet, Deloitte did not apply any additional procedures or gather further audit evidence to resolve this discrepancy.

146.    In 2007, TBW retained another third-party consultant, MIAC, to value its MSRs. MIAC's valuation report reflected a discrepancy of approximately $800 million between TBW's servicing records and the corresponding loans sold into the AOT and COLB facilities that were reflected in Deloitte's working papers.

147.    The discrepancy evidenced that TBW was servicing far fewer loans than it claimed to have sold, a result of the fact that the loans it was claiming to sell were fabricated.  Again, Deloitte did nothing to investigate that discrepancy as it was required to under GAAS.

148.    In 2008, TBW again retained MIAC to value its MSRs.  MIAC reported approximately $1.7 billion in unpaid principal balances on loans owned by Colonial under the AOT and COLB facilities that TBW was servicing.  That figure reflected a $1.4 billion discrepancy with the $3.1 billion in loan balances TBW claimed to have sold to Colonial under those facilities.

149.    For the first time, on the last day of the 2008 audit, Deloitte finally asked about the $1.4 billion discrepancy between these entries, which should have matched.

150.    Recognizing this billion-dollar-plus discrepancy in 2008, Deloitte requested an explanation and back-up information to permit it to reconcile the conflicting amounts.

151.    De Armas responded that there was no back-up loan list for the $3.1 billion in loans and that the discrepancy pertained to approximately $1.4 billion of mortgage loans that TBW had sold to Colonial "servicing released," meaning that TBW did not retain the right to service those loans.

152.    The assertion that TBW might have sold $1.4 billion in loans without retaining the MSRs was a red flag.  Indeed, De Armas's representation conflicted with (a) TBW's business model, which was to retain the servicing rights for the vast majority of the loans it sold; (b) the agreements with Colonial and takeout purchasers, which called for TBW to retain the servicing rights; (c) the assumptions in the True Sale Opinions; and (d) Deloitte's understanding of TBW's loan servicing and sales processes.

153.    De Armas's misrepresentation was also illogical because the documentary detail (i) was necessary to value the MSR portfolio and audit accounts receivable, (ii) was needed in order to track and record TBW's retained 1% haircut in the loans purportedly sold to Colonial, and (iii) was information that is routinely kept and maintained in the mortgage underwriting and servicing industry.  Indeed, Steve Potts, a member of Deloitte's audit team, even said that De Armas's representation did not make sense and that there must be detail of the loans that were off balance sheet.

154.    Rather than obtain audit evidence sufficient to substantiate TBW's accounting for the $3.1 billion in off-balance-sheet loans under the AOT and COLB agreements, Deloitte accepted TBW Management's nonsensical representation that it lacked documentary support for billions of dollars of transactions and that it had sold over $1 billion in loans without retaining MSRs.

155.    Deloitte did nothing to resolve the material inconsistency between De Armas's representation and the other audit evidence.

156.    Not only did Deloitte rely on De Armas, it turned a blind eye to known misrepresentations to avoid having to confront the fraud.  According to a member of TBW's accounting department, Corristan and De Armas had a "[w]ink, wink, nod, nod" understanding wherein Deloitte would blindly accept TBW's nonsensical explanations.

157.    Deloitte wholly abandoned its professional obligation to view De Armas's illogical statements skeptically.  Deloitte was not permitted to conclude its audit with a materially inconsistent Management representation that was insufficient to resolve a documented inconsistency of this magnitude.

158.    Overall, multiple pieces of audit evidence in Deloitte's own audit files pointed to TBW's misuse of the COLB and AOT facilities and the misstatement of TBW's financial position due to fraud.  By failing to investigate TBW Management's inconsistent representations and failing to obtain sufficient audit evidence, Deloitte ignored red flags that, upon a proper audit, should have disclosed the material misstatements that were at the heart of the fraud.

c.      **Deloitte failed to obtain appropriate audit evidence relating to hundreds of millions of dollars of inter-company obligations between TBW and Ocala.**

159.    Deloitte's negligence is further evident from its auditing of large inter-company receivables between TBW and Ocala.  Deloitte ignored evidence indicating that (i) TBW and Ocala were acting in a manner materially inconsistent with Ocala's governing agreements and were engaging in transactions with each other that contradicted Deloitte's understanding of Ocala's business and purpose as a bankruptcy-remote funding vehicle; and (ii) Ocala was violating its contracts with third-party investors.

160.    Deloitte knew that TBW established Ocala as a wholly-owned subsidiary to serve as a funding vehicle for TBW's loan origination and purchase activities. Ocala was supposed to purchase loans from TBW, thus providing TBW with funds to facilitate additional loan originations or acquisitions by TBW.

161.    The loans Ocala purchased were supposed to provide the primary collateral for its debts to third-party investors. Because the mortgage loan assets should have remained on Ocala's books until Ocala received the proceeds from the sale of those loans, Ocala's assets should have at all times consisted solely of the mortgage loans it acquired from TBW and the cash it generated from the subsequent sale of those loans.

162.    Deloitte knew this – the Audited Financial Statements confirmed its understanding that Ocala's debt obligations were secured by mortgage loans held for sale and restricted cash.

163.    Because it was a bankruptcy-remote vehicle, Ocala should not have held large inter-company receivables from TBW in the normal course of operations.

164.    Yet, contradictory evidence obtained by Deloitte demonstrated that Ocala's purported assets included large inter-company receivables due from TBW. As early as 2006, TBW's financial records reflected a large inter-company obligation owed to Ocala, when none should have existed. Deloitte's audit files for TBW showed inter-company payables owed to Ocala of $62 million in 2006, $198 million in 2007, and $643 million in 2008. The $643M receivable in 2008 was Ocala's largest reported asset.

165.    TBW's large inter-company obligations to Ocala contravened Ocala's business purpose, the terms of the Ocala facility, the TBW-Ocala agreements, and Deloitte's understanding of TBW and Ocala and the transactions between them.

33

166.     Yet, Deloitte did not apply audit procedures to test the inter-company receivables to determine what they were and the business justification.  Deloitte should have applied audit procedures to properly analyze why the receivable existed and tested whether TBW was operating Ocala in a manner that violated the debt and contractual obligations of the consolidated entity.

167.     Deloitte's failure to do so ignored the warnings in its own audit papers about the risks arising from these transactions.  Specifically, Deloitte was well aware of the risk that TBW could be "double-pledging . . . loans to more than one creditor."  Moreover, Deloitte noted that "there are loans and notes receivable to related parties" and that "[t]he validity, classification and collectability of these is a fraud risk."

168.     As a result, Deloitte stated that it "will look for signed agreements and whether payments are being made."  In other words, Deloitte saw the risk of the very fraud that the conspirators were conducting and determined that the audit team needed to apply procedures to reduce those risks.

169.     But Deloitte failed to apply sufficient procedures to respond properly to the risks indicated by Ocala's material inter-company receivables, including its failure to investigate and understand whether such balances represented appropriate and valid collateral for Ocala's outstanding commercial paper.  Deloitte's work papers show that it stopped short of considering whether the material inter-company receivable balances conformed with the terms of Ocala's agreements with TBW.  Those work papers also show that Deloitte failed to apply sufficient audit procedures to test the collateral associated with these inter-company balances (wherever located) during 2007 and 2008.

170.    Rather than investigating and gathering appropriate audit evidence, Deloitte simply ignored the conflicting audit evidence. In doing so, Deloitte failed to obtain a sufficient basis to support its unqualified audit opinions under GAAS and turned a blind eye to evidence that could have revealed the material financial misstatements and the misuse of Ocala by TBW Management.

**d.    Deloitte inexplicably wrote off the risk of fraud in revenue recognition and failed to apply necessary procedures to resolve the risk of overstatement of loan sales.**

171.    Deloitte also failed to apply sufficient audit procedures to TBW's revenue recognition – a violation of core auditing principles.

172.    Under GAAS, Deloitte was required to presume the existence of a risk of material misstatement due to fraud relating to the overstatement of TBW's revenue, including its reported gains on mortgage loan sales. Deloitte's own internal guidance emphasized this obligation, stating that Deloitte "should ordinarily presume that there is a risk of material misstatement relating to revenue recognition."

173.    Despite this unequivocal guidance in each of the 2006, 2007, and 2008 audits – and in earlier years – Deloitte improperly dismissed at the outset the risk of fraud relating to the overstatement of TBW's revenue. To justify its position, Deloitte documented the nonsensical explanation that "all loan sale revenue is a direct function of loans held for sale."

174.    Despite this flawed reasoning, Deloitte planned audit procedures from at least 2006 to 2008 that required the audit team to "obtain a schedule of loan sales and make a selection of loan sales, including sales involving only a portion of the loan, if any, and sales with recourse provisions, if any, during the audit period."

175.    Yet, Deloitte again failed to follow its own audit plans: it performed an audit procedure designed to address only the risk of revenue understatement.

176.    When Deloitte selected loans to audit, it did not – as it should have – choose its sample from a complete schedule of loan sales, but instead selected from a schedule of loans that had been closed between TBW and the home purchaser (*i.e.*, loans underwritten by TBW). Moreover, Deloitte's loan selection did not include a single loan sold to Colonial under the COLB or AOT facilities.  In fact, Deloitte did not apply any loan-selection process based on risk criterion or analytics until 2009.

177.    This testing wholly circumvented the necessary connection between the audit procedure and the revenue reported in the general ledger derived from loan sales.  The sample omitted categories of loan sales feeding the general ledger that were most likely to result in revenue overstatement due to fraud – *i.e.*, purported sales of loans that had not been underwritten because they did not exist at all.  In this way, Deloitte blinded itself at the outset by limiting the loans it was examining to those that were least likely to be fraudulent and ignoring the loan sales that were most susceptible to fraud in revenue recognition.

e.    **Deloitte failed to properly audit allowances for loans and related accounts.**

178.    Deloitte also failed to conduct sufficient audit procedures to determine whether TBW's reported loan and loan-related allowances were reasonable under GAAP, even turning a blind eye to information it gathered during its audits.

179.    Under GAAS and GAAP, a proper allowance calculation for loan and loan-related losses required Deloitte to apply situation-specific risk factors, including historic loss rates according to collateral type, location, borrower quality, and other factors.  Deloitte was repeatedly confronted with information indicating that TBW's allowances were insufficient, unsupported, or missing.

a.    For example, during 2008, Deloitte accepted TBW's use of its historical loan loss reserve rate on sold REO properties, despite documenting its understanding that actual losses had increased during the prior year by more

36

than 11% of the loan value. Importantly, this reserve was used to compute both TBW's REO portfolio and its loan repurchase reserves.

b.  In addition, in the audit years prior to 2008, Deloitte failed to appropriately address why loss allowances had not been established for TBW's interest receivable and escrow advance accounts. These accounts totaled nearly $20 million as of December 31, 2007.

c.  In a third example, during 2007, Deloitte documented that the mortgage loans for a condominium project in Florida were likely subject to repurchase from Freddie Mac due to suspected misrepresentations in the loans. Deloitte further noted TBW's conclusion that "any loss from repurchase/foreclosure would be in excess of [its] historical repurchase/REO loss due to the sheer number of default loans within the geographical areas." Nevertheless, Deloitte accepted without basis TBW's historical loan loss reserve rate for such loans, which did not account for the unique geographical and repurchase risks attendant to these specific properties.

180.    Even worse, Deloitte ignored evidence that TBW was misusing the Colonial AOT and COLB facilities by transferring non-qualifying repurchased loans to the facilities in violation of the underlying agreements.

181.    Deloitte's work papers indicate that, after repurchase in 2008, TBW placed the mortgage loans for the Florida condominium project on Colonial's AOT and COLB facilities, despite the fact that violations of representations and warranties clearly existed.

182.    This strongly indicated that TBW was selling impaired, non-compliant loans into the AOT and COLB facilities, and thus misusing those facilities in violation of TBW's contractual obligations.

183.    Deloitte failed to make any follow-up inquiries regarding this TBW practice, which was at the heart of the conspirators' fraud.

**f.    Deloitte failed to perform audit procedures and gather appropriate evidence to resolve material inconsistencies effecting TBW's reported income, including billions of dollars of unsupported journal entries.**

184.    The 2008 audit process demonstrates Deloitte's improper overreliance on TBW Management representations and flawed internal controls and Deloitte's failure to perform its audits according to professional standards, in light of the known risks of material misstatement related to revenue recognition and management overrides.

185.    On July 29, 2008, at the end of the audit, Deloitte certified that it had completed all of its audit procedures for TBW.

186.    Yet, from July 28 – just one day earlier – through July 30, the day after Deloitte signed its Independent Auditors' Report, Deloitte was trying to "gain an understanding" of accounts representing the bulk of TBW's revenue.    This critical but last-minute analysis evidenced Deloitte's previous failure to perform necessary audit procedures concerning TBW's revenue and its overreliance on TBW's nonexistent internal controls.

187.    Specifically, on July 29 and into July 30, 2008 – in the hours and minutes leading up to and following issuance of its unqualified audit opinion – Deloitte was struggling to understand significant TBW accounts and billions of dollars of journal entries affecting TBW's revenue.

188.    Deloitte knew that TBW lacked any formal process for reviewing and approving overriding journal entries.  As Brian Callahan, a TBW employee, testified, it appeared that TBW "has no controls whatsoever."

189.    Accordingly, Deloitte documented that "[w]ithout a proper review and approval process, the possibility exists for inaccurate, invalid, or inappropriate journal entries to be made and not be detected by management on a timely basis."

190.    Despite the control deficiencies, Deloitte failed to collect sufficient audit evidence to resolve material inconsistencies and unsupported journal entries exceeding $6 billion in gross credits and debits.

191.    Just hours before Deloitte would authorize its unqualified audit opinion, Deloitte started probing $6 billion in journal entries that included some of the fraudulent transactions. At noon on July 29 – the day the audit was due – Corristan admitted, "I am not sure what you are doing here" in discussing the $6 billion of entries.

192.    De Armas responded that the entries related to "loan sale activity" and should have been "reclassed" to a different account. As Corristan confirmed, the $6 billion was "in one financial statement account and . . . should be located in another financial statement account."

193.    A mere sixteen minutes before the audit deadline, Deloitte had still not resolved its confusion relating to TBW's treatment of numerous material accounting entries.   Corristan admitted:   "I can't figure out what escrows and FHA/VA payable issues that impact the P&L have to do with the gains on sale of loans."

194.    Many of the entries in these accounts were the subject of top-level management overrides that were not subject to internal controls, requiring additional audit procedures.   For

example, in 2008, conspirator Sean Ragland made top-level revisions to account balances that were almost equal in size to TBW's annual profit.[3]

195.    TBW's repeated misclassifications and management-level overrides were further evidence of what Deloitte already knew and documents showed – the internal controls on which it was relying were, in fact, not reliable.

196.    Yet, Deloitte failed to obtain appropriate audit evidence to substantiate TBW Management's claims about the accounting treatment for these entries and instead relied on their inconsistent and incomplete explanations of the entries and related transactions.  Despite its obligation to gather additional audit evidence, Deloitte failed to do so and instead issued its unqualified audit opinion on TBW's Audited Financial Statements without sufficient audit evidence.

197.    Deloitte's failure in relying on TBW Management was not limited to a few transactions, however – Deloitte knew it should not have relied on De Armas at all.  On numerous occasions, when De Armas was confronted with accounting questions, his response expressed indifference toward how the accounting entries were recorded, evidenced a fundamental lack of internal controls in the accounting processes, and were materially inconsistent with other audit evidence.

198.    Melissa Davis, a member of Deloitte's audit team who went to work for TBW, warned Deloitte as early as 2006 that De Armas was "obviously playing with the results" to

---

[3] On information and belief, material overrides also incurred in prior years.

achieve desired outcomes and was "not conversant [with] the basic [GAAP] accounting for a mortgage company."

199.    Despite this warning, Deloitte continued to rely on De Armas.

200.    TBW's audit obligation was cumulative, and given the many other pieces of inconsistent evidence and the indifference of TBW's CFO toward accurate accounting and proper controls, Deloitte had an obligation to challenge De Armas's misrepresentations, apply additional audit procedures, and collect competent audit evidence before it could provide assurances with respect to TBW's Audited Financial Statements. Instead, Deloitte signed the audit opinion knowing full well that it was relying on deficient safeguards and inconsistent evidence.

201.    More fundamentally, the repeated misclassification of accounting entries by TBW Management -- and Deloitte's failure to resolve its questions concerning them before issuing the Independent Auditors' Report -- demonstrate Deloitte's failure to comply with GAAS.

202.    The rush to certify TBW's financial statements in the face of obvious, material accounting misstatements was a dereliction of Deloitte's duty to Freddie Mac and the public.

\* \* \* \* \*

203.    Undeterred by the foregoing red flags and other accounting deficiencies, Deloitte issued unqualified Independent Auditors' Reports that TBW's Audited Financial Statements fairly presented the financial position of TBW without material misstatements due to error or fraud.

204.    In light of these repeated failures to comply with GAAS, Deloitte was precluded from issuing its unqualified opinions of TBW's Audited Financial Statements.

205.     Had Deloitte performed GAAS-compliant audits, it would have uncovered the material misstatements related to the fraud at TBW and prevented the fraud from continuing and growing to the detriment of Freddie Mac and others.

**J.      Freddie Mac Purchased Mortgage Loans from TBW Relying on Deloitte's Representations.**

206.     Deloitte knew that Freddie Mac would receive and rely on the Independent Auditors' Report, the Audited Financial Statements, and the Internal Control Reports, including Deloitte's representations of its compliance with GAAS and of the conformity of the Audited Financial Statements with GAAP.

207.     Indeed, Deloitte's engagement letters and Internal Control Reports identified Freddie Mac as an intended recipient of Deloitte's work product.

208.     As TBW's auditor, Deloitte knew that TBW was required to submit the Independent Auditors' Reports, Audited Financial Statements, and Internal Control Reports to Freddie Mac for its reliance.

209.     Based on its familiarity with TBW's business operations, Deloitte knew that Freddie Mac purchased billions of dollars of loans from TBW.

210.     Indeed, as Deloitte knew, Freddie Mac was the largest purchaser of TBW-originated mortgages.

211.     On behalf of Deloitte, Corristan confirmed that Deloitte understood that "the responsibility we have is to the entity or the people that engage us and then the users of the financial statements." Corristan confirmed that the users of the Audited Financial Statements and Auditors' Reports included Freddie Mac: "in this specific case, it would be -- reports filed with Ginnie Mae, with HUD, with Freddie Mac, and with other creditors."

212. Thus, Deloitte knew that Freddie Mac was relying on its TBW audits to do business with and purchase loans from TBW.

213. In reliance on the material misrepresentations in Deloitte's Independent Auditors' Reports of TBW's Audited Financial Statements, Freddie Mac (a) approved TBW as an authorized Seller/Servicer from 2002 through August 4, 2009, (b) entered into Master Agreements and Master Commitments with TBW, and (c) purchased TBW-originated mortgages.

214. If Deloitte had not issued its unqualified opinions of TBW's Audited Financial Statements, Freddie Mac would not have purchased mortgage loans from TBW, nor allowed TBW to service loans owned or guaranteed by Freddie Mac.

215. Freddie Mac's reliance was reasonable and justified because Deloitte is a CPA firm that purported to conduct its audits in accordance with GAAS and had a duty not to issue unqualified opinions of TBW's Audited Financial Statements if they contained material misrepresentations.

**K. TBW Collapsed Under the Weight of its Fraud and Filed for Bankruptcy.**

216. Deloitte could have prevented Freddie Mac's losses had it conducted GAAS-compliant audits of TBW.

217. During the 2009 audit, Deloitte could not ignore the red flags any longer. It starting asking questions and demanding competent audit evidence, which, pursuant to GAAS, it should have been doing all along.

218. With knowledge that TBW Management was perpetrating a fraud that rendered TBW's Audited Financial Statements materially false, Deloitte pulled its audit team from the field on June 16, 2009.

43

219.  Yet, Deloitte's failures continued.  After pulling its team from the field, Deloitte acted for its own benefit rather than alleviating the known risk that Freddie Mac and other end users were continuing to rely on unreliable audits from prior years.

220.  Testimony from a member of Deloitte's audit team shows that Deloitte knew that the fraud had affected the same accounting entries in prior years, rendering TBW's prior years' Audited Financial Statements materially misstated and Deloitte's Independent Auditors' Reports wrong.

221.  Nonetheless, Deloitte remained silent despite its knowledge that TBW was lying about the reasons the audit had not been completed.  Shortly after TBW told Ginnie Mae and Freddie Mac about the delay in the issuance of TBW's Audited Financial Statements, Ginnie Mae spoke with Deloitte about that delay, and specifically informed Deloitte that TBW had represented to it that the delay was not caused by unresolved accounting issues.  Deloitte knew that TBW was lying to the end users of the audits that were continuing to do business with TBW. Under these circumstances, Deloitte should have obtained assurances from TBW and/or its Board of Directors that disclosures had been, or would be, made to Freddie Mac that TBW's prior financial statements were false and unreliable.  Deloitte did not do so.

222.  When Deloitte failed to obtain reasonable assurances of the necessary disclosures, Deloitte itself was obligated to make the disclosures to Freddie Mac.  Yet, rather than disclose to Freddie Mac that Deloitte's prior Independent Auditors' Reports and TBW's Audited Financial Statements could not be relied upon, Deloitte remained silent.

223.  On information and belief, Deloitte's failure was motivated by a desire to protect itself from the consequences of its faulty audits from 2002 through 2008.

224.    Unaware that Deloitte had discovered the fraud at TBW during its audit in 2009, Freddie Mac continued to purchase mortgage loans from TBW.

225.    Upon learning that the federal authorities had executed search warrants at TBW, Freddie Mac terminated TBW's Seller/Servicer status and ceased purchasing loans from TBW on August 4, 2009.

226.    TBW filed for Chapter 11 bankruptcy protection on August 24, 2009.

227.    Since the bankruptcy filing, Mr. Farkas was convicted of fraud and his co-conspirators at TBW and Colonial have pled guilty.

**L.    Freddie Mac Suffered Significant Losses Due to Deloitte's Wrongful Acts.**

228.    If Deloitte had properly discharged its duties and refused to certify TBW's misstated Audited Financial Statements, Freddie Mac would not have continued conducting business with TBW and purchasing mortgage loans from TBW.

229.    As a direct and proximate result of Freddie Mac's reliance on Deloitte's misstatements, Freddie Mac incurred damages exceeding $1.3 billion, plus interest.

230.    At the time of TBW's collapse, TBW had sold to Freddie Mac thousands of loans that TBW was required to repurchase. TBW has failed to repurchase the loans, causing significant monetary damages to Freddie Mac.

231.    Freddie Mac's damages consist primarily – but not entirely – of losses arising from TBW's inability to honor its contractual obligation to repurchase mortgage loans that it sold to Freddie Mac.

232.    Freddie Mac has also incurred other losses attributable to the collapse of TBW that it would not have incurred but for Deloitte's negligence. Those losses include, but are not

limited to, expenses related to the transfer of servicing of loans Freddie Mac purchased from TBW, bankruptcy-related expenses, and other damages.

233.    In recognition of Freddie Mac's pecuniary injury, TBW agreed in its bankruptcy case that Freddie Mac sustained in excess of $1 billion in damages.

234.    Neither Deloitte nor any other party to TBW's bankruptcy case contested Freddie Mac's damage claim, which was allowed by the Bankruptcy Court.

## CAUSE OF ACTION

### I.    NEGLIGENT MISREPRESENTATION / FALSE INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS

235.    Freddie Mac repeats and realleges each of the proceeding paragraphs as if fully set forth herein.

236.    Deloitte is an independent CPA firm.

237.    Deloitte audited the financial statements of TBW and performed auditing services for TBW under Florida law.

238.    Deloitte made and supplied at least the following false information, false material facts, and misrepresentations during the course of each of its professional audits of TBW:

a.    TBW's Audited Financial Statements presented fairly, in all material respects, the financial position of TBW and its subsidiaries and the results of its operations and its cash flows in conformity with GAAP;

b.    TBW's Audited Financial Statements were free of material misstatements due to mistake or fraud;

c.    Deloitte had a reasonable basis for making the statements contained in the Independent Auditors' Reports;

46

     d.     Deloitte planned and performed its audit to obtain reasonable assurances about whether the Audited Financial Statements were free of material misstatements; and

     e.     Deloitte conducted its audits in accordance with GAAS and the Government Auditing Standards issued by the Comptroller General of the United States.

239.   Deloitte obtained and communicated this false information because it conducted negligent and grossly negligent audits of TBW's annual Audited Financial Statements.

240.   Deloitte knew Freddie Mac would receive for its use and benefit and rely on TBW's Audited Financial Statements, Deloitte's Independent Auditors' Reports, and the Internal Controls Reports in doing business with TBW.

241.   Deloitte owed Freddie Mac a duty to conduct its audits according to professional standards of care.

242.   Deloitte breached its duties as set forth herein.

243.   If it had met its professional standards of care, Deloitte would have uncovered and revealed the material misstatements in TBW's Audited Financial Statements and would not have provided unqualified opinions of them.

244.   Deloitte instead provided unqualified Independent Auditors' Reports for each year from 2002 through 2008 that failed to indicate the presence of fraud or material misstatements in TBW's Audited Financial Statements to those relying on the reports, including Freddie Mac.

245.   In addition, in 2009, Deloitte was told about the fraud at TBW and material misstatements that impacted its prior years' Audited Financial Statements. Despite this, Deloitte

failed to notify Freddie Mac or ensure Freddie Mac received notice of the unreliability of the Audited Financial Statements.

246.   From 2002 through August 3, 2009, Freddie Mac justifiably relied on Deloitte's Independent Auditors' Reports, the Audited Financial Statements, and the Internal Control Reports in approving TBW as a Seller/Servicer, purchasing TBW-originated mortgage loans backed by corresponding repurchase guarantees, and allowing TBW to service loans owned by Freddie Mac.

247.   Deloitte knew that Freddie Mac would rely on its audits in entering into such transactions and doing business with TBW.

248.   In 2009, Freddie Mac justifiably relied on Deloitte's silence about the fraud that rendered the prior years' Audited Financial Statements and Independent Auditors' Reports materially inaccurate and unreliable.

249.   Deloitte knew that Freddie Mac would rely to its detriment on Deloitte's silence relating to the 2009 audit.

250.   As a direct and proximate result of Freddie Mac's reliance on Deloitte's misstatements, Freddie Mac incurred damages in excess of $1.3 billion, plus interest.

251.   Deloitte's conduct constituted gross negligence, and was so reckless and/or wanting in care so as to constitute conscious disregard and/or indifference to the rights of Freddie Mac and others relying on Deloitte's audits. Deloitte, its partners, directors, officers, or managers actively and knowingly participated in the conduct constituting gross negligence; knowingly condoned, ratified, or consented to such conduct; and/or engaged in the conduct that constituted gross negligence and contributed to Freddie Mac's losses.   Because Deloitte's

conduct amounts to gross negligence, Freddie Mac seeks punitive damages of three times the amount of compensatory damages or the maximum allowed by law.

## PRAYER FOR RELIEF

252.     Freddie Mac respectfully requests judgment against Deloitte, under all applicable causes of action, granting Freddie Mac the following relief:

      i.      Actual, compensatory, and consequential damages in an amount to be proven;

      ii.      Punitive damages;

      iii.      Prejudgment and postjudgment interest;

      iv.      Costs; and

      v.      Such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Freddie Mac demands a trial by jury of all issues so triable.

February 20, 2015.

Respectfully submitted,

Isaac J. Mitrani
Florida Bar No. 348538
imitrani@mitrani.com
Pamela A. Chamberlin
Florida Bar No. 444006
pchamberlin@mitrani.com
MITRANI,   RYNOR,   ADAMSKY   &
TOLAND, P.A.
301 Arthur Godfrey Road
Penthouse
Miami Beach, Florida 33140
Phone: (305) 358-0050
Fax: (305) 538-0550

Paul D. Moak
pmoak@mckoolsmith.com
Joshua Newcomer
jnewcomer@mckoolsmith.com
MCKOOL SMITH P.C.
600 Travis Street, Suite 7000
Houston, TX 77002

Kyle A. Lonergan
klonergan@mckoolsmith.com
MCKOOL SMITH P.C.
One Bryant Park, 47th Floor
New York, NY 10036

Mike McKool
mmckool@mckoolsmith.com
Lewis T. LeClair
lleclair@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201

George A. Kielman
george_kielman@freddiemac.com
Scott L. Walker
scott_walker@freddiemac.com
FEDERAL HOME LOAN MORTGAGE
CORPORATION
8200 Jones Branch Drive, MS 202
McLean, VA  22102

*Attorneys for Plaintiff Federal Home Loan
Mortgage Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by email, on all

counsel on the attached service list, on February 20, 2015.

Isaac J. Mitrani
Florida State Bar No. 348538
imitrani@mitrani.com
Pamela Chamberlin
Florida State Bar No. 444006
pchamberlin@mitrani.com
MITRANI, RYNOR,
ADAMSKY & TOLAND, P.A.
301 Arthur Godfrey Road
Penthouse
Miami Beach, FL 33140
United States of America
Telephone:  305.358.0050
Facsimile: 305.358.0550

## SERVICE LIST

Peter Prieto, Esq.
PPrieto@podhurst.com
John Gravante III, Esq.
JGravante@podhurst.com
Matthew Weinshall, Esq.
MWeinshall@podhurst.com
PODHURST ORSECK P.A,
25 West Flagler Street, Suite 800
Miami, FL 33130

Miles N. Ruthberg, Esq.
miles.ruthberg@lw.com
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4834

Peter A. Wald, Esq.
peter.wald@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538